HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DONALD LEE HOSKIN and BLANCHE JANE HOSKIN, a married couple,<br><br>Plaintiffs,<br><br>v.<br><br>PIERCE COUNTY DEPUTY SHERIFF ROBERT LARSEN, personally and in his official capacity, et al.<br><br>Defendant. | NO. C06-5559 RBL<br><br>ORDER DENYING PIERCE COUNTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment. Dkt. #17. The Court has considered the pleadings filed in support of and in opposition to the motion and the entire file herein. For the reasons stated below the motion is DENIED.

## PROCEDURAL BACKGROUND

Plaintiffs allege that on January 22, 2004 deputies of the Pierce County Sheriff's Department and officers of the Washington Department of Corrections (DOC) violated their constitutional rights and inflicted physical and emotional injuries. Dkt. #1. The confrontation took place at plaintiffs' home as defendants searched for Hoskins' son, Corey, who was wanted for probation violations.

In their complaint, plaintiffs claim that Mr. Hoskin was unlawfully arrested and that defendants used excessive force in effecting the arrest. *Id.* They also claim their Fourth Amendment rights were violated during an unlawful search of their home. *Id.* Corresponding state law claims for negligently

causing physical injuries to Mr. Hoskin, negligently causing emotional distress to Mrs. Hoskin and for trespass are also included in the complaint. *Id.*

The complaint was originally filed in Pierce County Superior Court on September 12, 2006. The action was removed to this Court on September 27, 2006. *Id.*

The instant motions were filed on August 27 and 28, 2007. Dkt. #s 17, 20.  Plaintiffs have withdrawn their negligent infliction of emotional distress claim, Dkt. #24, and their wrongful arrest claim, Dkt. #26.  The DOC defendants settled all claims with plaintiffs on October 4, 2007. Dkt. #31.  The negligence claim against the Pierce County Defendants was dismissed on October 18, 2007. Dkt. #34.

Claims that remain include 42 U.S.C. §1983 alleging use of excessive force and unlawful search and the state law claim of trespass.

## **FACTUAL HISTORY**

**A.    The Search for Corey Hoskin.**

Between 1999 and 2001, Corey Hoskin was arrested twice for domestic violence. Dkt. #24-3.  He was convicted on one incident for third degree assault. *Id.*; 17-7, Ex. 23. The other incident did not result in a conviction. *Id.*

In March of 2002, Hoskin, along with others, was involved in a high speed chase with police. Dkt. #17-8, Ex. 30.  When apprehended he identified himself as Brandon Hoskin, his brother. *Id.*  Corey was arrested for attempting to elude police and for second degree identity theft. *Id.*  Significantly, a knife and two 9mm bullets were found in the chase vehicle. *Id.*

On May 12, 2003, Hoskin was contacted by Community Correction Officers (CCOs) and fled. Dkt. 17-8, Ex. 27.  Property belonging to Hoskin was found in a nearby stolen vehicle. *Id.*

Hoskin's record also includes a conviction for second degree possession of stolen property. Dkt. #17-8, Ex. 28.

At the time of the subject incident sheriff's deputies considered Hoskin to be a dangerous offender as he had previously threatened to kill people, brandished weapons on multiple occasions, had a long history of drug abuse and had been seen several times leaving an area while armed with a pistol. Dkt. #17-2, Ex. 2.  Notwithstanding this history, DOC had Hoskin on low level supervision indicating he was not considered a violent or high-risk offender. Dkt. #21-2.

As of January 22, 2004, Hoskin had failed to report to the DOC as a required condition of probation. Dkt. #17-2, Ex. 1. Moreover, he had failed to complete his treatment program, had consumed methamphetamine and had failed to notify DOC of a change of address. *Id.* A warrant for his arrest had been issued. *Id.*

**B.   Residence of Corey Hoskin.**

According to DOC records, Hoskin resided at 14720 190th Avenue KPN, the same address as the plaintiffs/parents. Dkt.#17-7, Ex. 23; 17-8, Ex. 24-28. Defendant Holton (CCO), has testified that Corey Hoskin would not have been allowed to live with his parents. Dkt. #28-8. Indeed, Mrs. Hoskin testified that her address was never listed with DOC as Corey's residence. Dkt. #21-3. She claims that Corey's DOC-approved residence was with his grandmother, Mrs. Chadwick, who lived down the drive at 14719 190th Avenue KPN. *Id.* While CCO Holton and CCO Ager were told that Corey lived with his grandmother, they checked plat maps and concluded that the Hoskin residence and the Chadwick residence were on the same property. Dkt. #21-8. The plaintiffs claim the property was legally divided in 1984. Dkt. #21-3.

Less than a year before the subject incident, CCOs Holton and Ager went to Chadwick's home to verify that Corey was living there. Dkt. #21-8. A search of the premises revealed only one drawer of socks belonging to Corey. *Id.* While the officers were still at the Chadwick residence, they observed Corey drive past the Chadwick residence to his parents' home. *Id.* The officers followed and requested to search the Hoskin residence. Dkt. #17-5, Ex. 6. Permission to search was refused whereupon Corey was handcuffed and taken back to the Chadwick residence. *Id.*

On May 5, 2003, DOC received an anonymous call that Corey was no longer living at his listed address. Dkt. #17-8, Ex. 28. Corey was found on May 12, 2003 at a non-listed residence but he fled from CCOs Holton and Ager. *Id.* That was the last contact DOC had with Corey before the incident involving his parents. There was some speculation by the DOC and the Federal Marshals that he may have fled to Hawaii, but the basis of that speculation is uncertain at this time. Dkt. #17-2, Ex. 1; 21-8.

**C.   The Confrontation of January 22, 2004.**

A tipster advised the DOC that Corey Hoskin had returned to the area, was armed, and might be at his parents' property. Dkt. #17-2, Ex. 1. The tipster, a known drug user under DOC supervision, was

ORDER
Page - 3

considered credible. *Id.* Although Corey's assigned CCO (Hilpert) was on sick leave at the time, CCO Holton contacted Hilpert's supervisor and "briefed her on the situation." Dkt. #21-8.

The plan for January 22, 2004 called for DOC officers and sheriffs deputies to divide into two teams to search the Hoskin residence and the Chadwick residence. Dkt. #17-3, Ex. 3. The events giving rise to this dispute occurred at the Hoskin residence.

When the team assigned to the Hoskin residence approached, Mrs. Hoskin emerged from the house carrying a concealed handgun. Dkt. #17-4, Ex 5. She was either relatively calm (Mrs. Hoskin, Dkt. #21-3) or highly agitated and yelling (the defendants, Dkt. #17-4, Ex. 4) as she confronted the assembled officers. Mrs. Hoskin was never searched. Dkt. #17-4, Ex 5.

Mr. Hoskin next exited the home and he too was carrying a concealed weapon in his front shirt pocket. Dkt. #17-4, Ex 5. He looped around the back of a circular driveway to confront a person he saw standing by a "civilian-looking" car on the bridge at the end of the drive. Dkt. #24-4. When he got to the car no one was there. *Id.*

Mr. Hoskin says that, while at the bridge, he observed DOC Officer O'Neal emptying five-gallon buckets of fish food out of Hoskin's pump house. Dkt. #24-4. He yelled at O'Neal to get out of the shed as he walked calmly toward Deputy Sheriff Larsen. *Id.* Hoskin told Larsen that the officers were trespassing and needed to leave. *Id.* Larsen told Hoskin that they were there on official government business and did not need a warrant. *Id.*

Mr. Hoskin recalls that Deputy Larsen asked if Hoskin had a gun, then put his hand out and asked for it. Dkt. #17-4, Ex 5. Hoskin says he put his hands out to the side and told Larsen that he did not want to touch the gun. *Id.* Larsen then removed the gun from Hoskin's pocket. *Id.* Hoskin disputes Larsen's account that the weapon actually had a bullet in the firing chamber. *Id.* He says that Larsen took the safety off, loaded the chamber, then jammed a stick in the gun to keep it from firing. *Id.*

After being disarmed, Hoskin claims Larsen told him to "assume the position." Dkt. #17-4, Ex 5. Hoskin says he told Larsen he didn't understand and that Larsen then spun him around and shoved him into a sheriff's car. *Id.* According to both plaintiffs, Larsen then kicked Hoskin's ankles apart which caused pain to Hoskin due to his bad hip. Dkt. #21-3. Hoskin says Larsen grabbed him by the hair, picked him up and slammed him onto the ground face first. Dkt. #21-4.

After Hoskin was on the ground, Mrs. Hoskin said he was handcuffed by two deputies other than Larsen. Dkt. #21-3. The couple says that Larsen then picked up Hoskin from a prone position by his handcuffs and dropped him, face-first, on the ground. *Id.* According to Mrs. Hoskin, as Mr. Hoskin was placed in the patrol car, he had three red lasers shining on him from the officers assault rifles trained on him. *Id.* Plaintiffs claim that some of the officers involved in the incident were wearing ski masks to conceal their identity. Dkt. #1.

Not surprisingly, defendants tell a different story of Mr. Hoskin's arrest. Deputy Larsen says he never asked Hoskin to "assume the position" and that he never forced Hoskin up against a vehicle. Dkt. 17-3, Ex. 3. He says he told Hoskin he needed to pat him down for more weapons. *Id.* Hoskin resisted by backing away. *Id.* At that point, Larsen says he used a leg sweep movement and gently brought Hoskin to the ground on his back. *Id.* CCO Bailey, however, says Larsen used a "Two Hand Hair Hold" to get Hoskin to the ground. Dkt. #24-6.

Deputy Larsen claims that Hoskin was resisting as he and Deputy Hopkins handcuffed him. Dkt. 17-4, Ex. 4. According to Larsen, once Hoskin was handcuffed, he assisted Hoskin to his feet, patted him down, and placed him in the patrol car without further incident. *Id.* The defendants deny that anyone wore masks or pointed a gun at either Mr. or Mrs. Hoskin, or even had a rifle equipped with a laser scope. Dkt. #17-4, Ex. 4; 17-5, Ex. 8; 17-7, Ex. 21, 22.

**D.    The Search.**

Mrs. Hoskin claims that Deputy Larsen threatened to arrest Mr. Hoskin if she did not consent to a search of her home. She alleges that Larsen knew that Hoskin would lose his job if he were arrested. According to Mrs. Hoskin, no one actually told her that her husband would be arrested if she did not consent to the search. Dkt. #20-2. She formed that impression, however, because on multiple occasions she was asked to consent while Larsen continued to administer the Miranda Warnings to her husband within earshot. Dkt. #24-3. Mrs. Hoskin claims that at one point she told Larsen that she would consent to a search so that he would not arrest her husband. *Id.*

For his part, Larsen says he merely Mirandized Hoskin and took him to a patrol car in case Hoskin decided to make any incriminating statement. Dkt. #17-3, Ex. 3. He denies that he was creating the appearance that Hoskin was being arrested. *Id.*

ORDER
Page - 5

Mrs. Hoskins says she asked Deputy Larsen if she could choose two people to go into the house for her. Dkt. #24-3. She chose CCO Bailey and CCO Ager. *Id*. A law enforcement officer, Deputy Myron, accompanied the two CCOs according to department protocol. Dkt. #24-6

## DISCUSSION

**A. Summary Judgment Standard**

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809, F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a genuine issue of material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. If one version of alleged facts are blatantly contradicted by the record so that no reasonable jury could believe those facts, the court should not adopt that version of the facts for purposes of summary judgment. *Scott v. Harris*, 127 S.Ct. 1769 (2007). The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson*, *supra*). Conclusory,

non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B. Title 42 U.S.C. § 1983 Claims**

Section 1983 provides as follows:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. In this case, "person" means the individual Sheriffs' Deputies in their individual capacity.[1] To "subject" another to the deprivation of a constitutional right means to personally participate in the deprivation by performing an affirmative act, participating in another's affirmative act, or failing to perform an act required by law. *Preschooler II v. Clark County School Bd. Of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (citing *Johnson v. Duffy*, 177 F.3d 839, 854 (9th Cir. 1978)). Defendants may also be liable for causing an individual to be subjected to a constitutional deprivation by setting in motion a series of acts by others that the defendants knew or reasonably should have known would cause a violation of the plaintiffs' constitutional rights. *Id*.

Under the doctrine of qualified immunity, government officials are immune from suit unless their actions violate clearly established law. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Qualified immunity is the right to be immune from suit. *Id.* at 526. The question of whether a defendant is entitled to qualified immunity must be resolved early in the proceedings to preserve this right. *Id.* Determining whether a defendant is immune from suit is a two-step inquiry: First, the plaintiff must demonstrate a violation of a constitutional right. The inquiry ends here if the plaintiff does not satisfy this prong. To determine whether this prong is satisfied, the court views the allegations in the light most favorable to the injured party. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words, the court asks whether taking all the allegations as true demonstrates a violation of a right secured by the Constitution.

---

[1] Plaintiffs' complaint stated a claim against the Sheriffs' Deputies in their official capacity which is equivalent to stating a claim against the Pierce County Sheriff's Department. *See Will v. Michigan*, 491 US 58, 71 (1989) Because plaintiffs subsequently denied they had any claim against the Pierce County Sheriff's Department Dkt. #24, this Court assumes that plaintiffs have abandoned the claim against the Sheriffs' Deputies in their official capacity.

Second, the plaintiff must demonstrate that the constitutional right was clearly established. *Id.* A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. Plaintiffs may not overcome qualified immunity by invoking abstract, general, but clearly recognized rights. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Rather, the right must be recognized in a particularized way so that the government officer may reasonably anticipate its violation. *Id.* at 639-40. If both prongs of the analysis are satisfied, the defendant is not entitled to qualified immunity and summary judgment or dismissal is not appropriate.

### 1. Excessive Force under the Fourth Amendment

The Hoskins claim that Deputy Larsen used excessive force when he "shoved" Mr. Hoskin against a vehicle, pulled him over backwards by his hair, lifted him off the ground from the prone position and dropped him, then tugged up on his handcuffs when walking him to and from the sheriff's vehicle. While the complaint states that other Pierce County Deputies are also liable for excessive force, the Hoskins do not make specific allegations against the other deputies.

#### a. Qualified Immunity

The Pierce County Deputies contend they are entitled to qualified immunity because Mr. Hoskin was carrying a weapon, was unresponsive to the officer's commands, and the only force used against Mr. Hoskin was a "simple leg sweep" necessary to execute a pat down. To determine whether the Pierce County Deputies are entitled to qualified immunity on this claim, the Court must first determine whether the Hoskins' allegations amount to a constitutional violation and then whether the constitutional right was clearly established at the time of the incident. *See Saucier*, 533 U.S. at 201.

##### i. Violation of a Constitutional Right

For the Hoskins to state a claim under 42 U.S.C. § 1983 for a Fourth Amendment violation, they must allege that the officers use of force was unreasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). The "reasonableness" of the use of force is determined objectively by weighing the intrusion on the individual's right against the competing governmental interest. *Graham*, 490 U.S. at 396. The test is applied by viewing all of the facts and circumstances from the "perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* The court balances the quantum of force used against the following factors: (1) severity of the crime at issue, (2) whether a person poses an immediate

threat to the safety of others, (3) whether a person is actively resisting arrest or attempting to flee, (4) whether the officer could have used less force to attain his objective. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007).

The plaintiffs are basing their claim on Deputy Larsen's actions in detaining Mr. Hoskin. The facts as alleged by the plaintiffs support the conclusion that Deputy Larsen's treatment of Mr. Hoskin was unreasonable. The Ninth Circuit has held that an unnecessarily painful detention may be unconstitutional. *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994). The Ninth Circuit has also previously held that unjustifiably causing pain by handcuffing a person too tightly is unconstitutional. *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993). If Deputy Larsen acted as alleged, the force used against Mr. Hoskin would be unreasonable. Mr. Hoskin was not suspected of committing a crime. The force was applied after Mr. Hoskin was disarmed and patted down. Concerns for officer safety could therefore have been ensured without lifting or tugging Mr. Hoskin by the handcuffs.

For the other deputies to be liable for Deputy Larsen's actions, the plaintiffs would need to allege and present facts to support the claim that these officers were "integral participants" in Mr. Hoskin's unconstitutional seizure. *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). "Integral participation" does not require that each officer's individual action amount to a constitutional violation. *Id*. However, it does require some fundamental involvement in the conduct that caused the violation. *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 fn. 12 (9th Cir. 2007).

The Hoskins asserted that two other officers assisted Deputy Larsen in handcuffing Mr. Hoskin. While they did not provide evidence regarding the identity of those officers, the defendants stated that Deputy Hopkins assisted Deputy Larsen in handcuffing Mr. Hoskin. Dkt. #17-4, Ex. 4. An officer is an integral participant in the constitutional violation when he assists in handcuffing a person and the constitutional violation culminates from that action. *Blankenhorn*, 485 F.3d at 481 fn. 12. Therefore, Deputy Hopkins is liable for any excessive force used by Deputy Larsen.

The plaintiffs do not meet their burden to show that the other deputies either directly violated their constitutional rights or were "integral participants" in Deputy Larsen's actions. Therefore, the Hoskins have not established that any other deputy has violated their Fourth Amendment right by the use of excessive force.

ORDER
Page - 9

### ii. Clearly Established Right

The Court must now determine whether the constitutional rights allegedly violated by Deputy Larsen were clearly established such that a reasonable government officer would understand the conduct at issue to be unlawful. A reasonable government official would understand the alleged actions of Deputy Larsen to be unlawful. Even Officer Larsen testified that lifting someone up by the handcuffs who is in a prone position on the ground would constitute "torture." Dkt. #21-5.

Deputy Hopkins was on notice in January 2004 that he would also be liable for a constitutional violation which culminated from his assistance in handcuffing a person. *Blankenhorn* was directly on point regarding this conduct. While *Blankenhorn* was not decided until 2007, the court stated that defendants in that case reasonably could have known they would be liable based on *Chuman v. Wright*, the 1996 case defining "integral participant." *Blankenhorn*, 485 F.3d at 481 Fn. 12 (citing, as supporting authority, *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)).

Deputy Larsen and Deputy Hopkins are not entitled to qualified immunity.

### b. Summary Judgment on the Merits

The Pierce County Defendants also contend that they are entitled to summary judgment on the merits. Summary judgment for excessive force claims should be "granted sparingly . . . because such cases almost always turn on a jury's credibility determinations." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). Summary judgment will not be granted if the Hoskins show a genuine issue of fact that refutes the Pierce County Defendants' contention that the force used on Mr. Hoskin was reasonable. *See Graham v. Connor*, 490 U.S. 386, 394 (1989).

Summary judgment on this issue must be denied because the Hoskins have raised several genuine issues of material fact such that the "reasonableness" of the officers' actions cannot be determined as a matter of law.

### 2. Unlawful Search under the Fourth Amendment

The Hoskins contend that the Pierce County Sheriff's Deputies violated their Fourth Amendment right to be free from an unreasonable search. They allege that Deputy Myron violated their constitutional right by searching their home. They further allege that Deputy Larsen is also liable for that violation because he coerced consent to the search by creating the impression that Mr. Hoskin would be arrested if

Mrs. Hoskin did not consent to the search. The plaintiffs have not specifically alleged that any other deputy is liable for an unlawful search.

### a. Qualified Immunity

The Pierce County Deputies claim they are entitled to qualified immunity. The Court will examine whether the search violated the Hoskins' constitutional right and whether that particular right was clearly established. *See Saucier*, 533 U.S. at 201.

### i. Violation of a Constitutional Right

To state a claim under 42 U.S.C. § 1983 for a Fourth Amendment violation, the plaintiffs must allege that the defendants conducted an unreasonable search. *Samson v. California*, 126 S. Ct. 2193, 2197 (2006). Under the Fourth Amendment, the Court examines the totality of the circumstances to determine whether a search is reasonable. *Id.* Reasonableness is determined by weighing the intrusion on the individual's privacy right against the promotion of a legitimate governmental interest. *Id.* A warrantless search is presumptively unreasonable apart from a few narrow exceptions. *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1947 (2006) (internal citations omitted).

The plaintiffs are basing their claim on the search performed by Deputy Myron. The Pierce County Defendants contend that the warrantless search by Deputy Myron did not violate the Hoskins' Fourth Amendment rights because (1) Mrs. Hoskin's consent to the search was voluntary, or, in the alternative, (2) the search was a lawful parole search.

Voluntary consent will transform a warrantless search into a reasonable search. *Georgia v. Randoph*, 547 U.S. 103, 128 (2006) (citing *Illinois v. Rodriquez*, 497, U.S. 177, 183 (1990)). The Pierce County Defendants have the burden to prove that consent was voluntary from the totality of the circumstances. *See United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). The Court considers the following factors: (1) whether the person was in custody; (2) whether the officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the individual was notified that he or she had the right to withhold consent; and (5) whether the individual was told that a search warrant could be obtained. *Patayan Soriano*, 361 F.3d at 502 (citing *United States v. Jones*, 286, F.3d 1146, 1152 (9th

Cir. 2002)).[2]

Taking the facts in the light most favorable to the plaintiffs, Deputy Myron has failed to show that Mrs. Hoskin's consent was voluntary. First, the Hoskins allege that Mr. Hoskin was in police custody and an arrest would have dire consequences for them. Second, Deputy Larsen does not dispute that he Mirandized Mr. Hoskin. Third, the officers did not tell Mrs. Hoskin that she had the right to withhold consent or that a search warrant could be obtained. In addition to those factors, the following circumstances suggest that the consent was not voluntary: Mrs. Hoskin refused consent to a search in 2003; and, she refused consent until after she heard Deputy Larsen read Mr. Hoskin his Miranda rights. The facts as alleged by plaintiffs indicate that any consent to search the residence was coerced, not voluntary.

A "reasonable parole search" conducted by law enforcement officers without a warrant does not violate the Fourth Amendment. *Montley v. Parks*, 432 F.3d 1072, 1079 (9th Cir. 2005) (en banc). The officers must have a "reasonable belief" that a suspect named in an arrest warrant or a parolee lives in the third party's home. The officer's belief must be supported by "some heightened knowledge that they are at the address where either the parolee or the subject of an arrest warrant resides." *Id*. The "reasonable belief" standard is equivalent to the probable cause standard. *Id*. at 1080 (citing *United States v. Gorman*, 314 F.3d 1105, 1111-15 (9th Cir. 2002)). Cases in which the Ninth Circuit has held that the officers had a "heightened knowledge" of a parolee's residence, the parolee did not appear to be residing at any other address, the officers directly observed the parolee using the residence just before the search; and, the parolee had a key to the residence.[3] *United States v. Howard*, 447 F.3d 1257, 1265-66 (9th Cir. 2006).

The police must obtain a search warrant if the police have probable cause to believe the parolee is present at another person's home but do not have probable cause to believe he is an actual resident. *United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991)(internal citations omitted).

Deputy Myron has not met his burden to show that he had a "reasonable belief" that Corey Hoskin

---

[2] While these factors were applied in criminal proceedings, the Court is satisfied that they apply with equal vitality in this civil case.

[3] The court, in *Howard*, lists a fourth consideration for determining whether a parolee was a resident: whether the parolee or a third person stated that the parolee lived at the residence. However, the court also reasoned that a co-resident's statement about where the parolee lives is not credible because the co-resident frequently has his or her own interest at stake.

resided at his parents' house at the time of the search. The record is unclear regarding how much information the officers had about Corey's residence. However, even if the officers had the same information as the DOC, it was not enough to justify a parole search. First, the officers did not know whether Corey was residing at another address. Not only was there speculation that Corey lived in Hawaii, Dkt. #21-8, the officers checked both the Hoskin residence and the Chadwick residence because they were uncertain which one was Corey's residence, Dkt. #17-2, Ex. 1. Second, none of the officers had seen Corey using the residence. Third, nothing in the record suggests Corey had a key to his parents' house. The facts alleged, if true, would establish that the officers did not have a "reasonable belief" that Corey Hoskin resided at his parents' home.

The plaintiffs allege that Deputy Larsen is also liable for the unlawful search because he coerced Mrs. Hoskin's consent. Larsen is liable if his involvement contributed to the unconstitutional actions of another. *See Blankenhorn*, 485 F.3d at 481 fn. 12. Based on the facts as alleged, Deputy Larsen is liable for the unconstitutional search because the search was conducted only after Deputy Larsen coerced Mrs. Hoskin to consent.

The plaintiffs have not alleged facts showing that any other officer unlawfully searched their home or "integrally participated" in the violation by Myron. Because plaintiffs have not shown that the unnamed officers, with the exception of Deputy Hopkins, violated plaintiffs' constitutional rights, the unnamed officers are entitled to qualified immunity.

### ii. Clearly Established

The Court must now determine whether the constitutional rights allegedly violated by Myron and Larsen were clearly established such that a reasonable officer would understand the conduct at issue to be unlawful.

First, a reasonable officer would know that consent given under the threat of having a family member arrested would be coercive. In fact, both CCO Bailey and Deputy Myron testified that they would not consider consent to be voluntary if a person only consented under the threat of serious consequences. Dkt. #24-6; 17-2, Ex. 2.

Second, the law clearly establishes that, at the time, officers would not have a reasonable belief regarding where a parolee was residing when that belief is based on the following factors: an

ORDER
Page - 13

uncorroborated tip; the parolee's presence in the driveway ten months earlier; an address on the record which was previously regarded as incorrect. The Ninth Circuit has previously held that an anonymous tip and the fact that the suspected parolee answered the door in his boxer shorts was insufficient to give officers a reasonable belief that the suspect resided at that home. *Watts v. County of Sacramento*, 256 F.3d 886, 890 (9th Cir. 2001).

Third, the law is clearly established that an officer would be liable for an unlawful search when he coerced a person to consent to that search. A reasonable officer would know that the coercion would lead to an unconstitutional search.

Deputy Larsen and Deputy Myron are not entitled to qualified immunity for the unlawful search claim.

**b. Summary Judgment Discussion**

In addition to claiming qualified immunity, the defendants move to dismiss this claim on the merits. However, the plaintiffs have raised genuine issues of material fact including (1) whether Mrs. Hoskin only gave consent under the threat of Mr. Hoskin's arrest, and (2) whether the officers had a reasonable belief that Corey Hoskin resided at his parents' home.

**C. Common Law Trespass**

The common law tort of trespass is an "intrusion onto the property of another that interferes with the other's right to exclusive possession." *Bosteder v. City of Renton*, 155 Wn.2d 18, 50 (2005) (quoting *Phillips v. King County*, 136 Wn.2d 946, 957 (1998)). A person has interfered with another's exclusive possession if he intentionally enters land or causes a third person to do so even if the person does not harm any legally protected interest. *See Peters v. Vinatieri*, 102 Wn. App. 641, 655 (2000) (citing Restatement (second) of Torts § 158 (1965)). However, a person is not a trespasser if that person is given express or implied permission to enter the premises. *See Singleton v. Jackson*, 85 Wn. App. 835, 839 (1997) (citing *Winter v. Mackner*, 68 Wn.2d 943, 945 (1966)). Also, a person may be privileged to enter another's property if the entry is reasonably necessary for that person to perform a duty or exercise authority created by the legislature if all the requirements of the legislative enactment are fulfilled. *Id.* (citing Restatement (second) of Torts § 211 (1965)).

The Pierce County Defendants are not entitled to summary judgment on this claim because, as discussed above, the plaintiffs have raised genuine issues of material fact including (1) whether the officers were given permission to enter the house, and (2) whether the officers were privileged by their duties as officers. Therefore, the summary judgment motion on the trespass claim is DENIED**.**

**D. Motion to Strike**

The plaintiffs filed a surreply requesting the Court to strike Pierce County Defendants' reply brief because it was filed a week after the noting date. The Court has the discretion to grant or deny the motion to strike. *Canady v. Erve Elektromedizin GmbH*, 307 F. Supp. 2d 2, 7 (D. D.C. 2004) (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664-65 (7th Cir. 1992)). Motions to strike are generally disfavored, *RDF Media Ltd. V. Fox Broadcasting Co.*, 372 F. Supp. 2d 556, 566 (C.D. Cal. 2005), and as a matter of policy, courts prefer to resolve a case on the merits. Consistent with that policy, this Court prefers to have all of the parties' arguments before it. Therefore, the motion to strike is DENIED.

## CONCLUSION

Summary Judgement is **DENIED** as to the section 1983 claims and the trespass claim, except to the extent that the unidentified officers are granted qualified immunity. The plaintiffs' motion to strike is also **DENIED**.

**IT IS SO ORDERED.**

DATED this 31st day of October, 2007.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
Page - 15